FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

02 SEP 30 PM 1:3.

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| BRENDA G. MARTIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CV 00-B-3533-S |
| | ) |
| AIG CLAIM SERVICES, INC.; | ) |
| ILLINOIS NATIONAL INSURANCE | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

ENTERED
SEP 30 2002

## MEMORANDUM OPINION

This case is presently pending before the court on motion for summary judgment filed by defendants, AIG Claim Services, Inc. ["AIG"] and Illinois National Insurance Company ["Illinois National"]. Doc. 71. Plaintiff alleges claims of breach of contract, bad faith, and fraud against Illinois National, arising out of a claim against plaintiff's automobile insurance policy with Illinois National. She alleges claims of fraud and tortious interference with a business relationship against AIG, arising out of adjustment services performed by AIG related to plaintiff's claim against the policy.

The parties have fully briefed the motion for summary judgment and the court heard oral argument. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that the motion for summary judgment (doc. 71) is due to be granted.

1

## I. **FACTUAL SUMMARY**[1]

In February 1999, plaintiff and her husband, Ronald Martin, purchased a new 1999 Mazda B2500 SE pickup truck. An automobile insurance policy with Illinois National covered the truck. The policy provided collision coverage for the truck with a deductible of $500. It provided for payment of the cost to repair any damage to the Martins' vehicle caused by a collision or payment of the actual cash value of the damaged vehicle, whichever was less. Both plaintiff and Ronald Martin were named insureds on the policy; the Alabama Credit Union was listed on the policy as the lienholder for the truck.

The Martins were divorced on May 26, 1999. In the divorce decree, Ronald Martin was awarded possession of the truck with the restriction that ownership and possession of the vehicle reverted back to plaintiff if he missed two payments. Further, Ronald Martin was to be responsible for the insurance deductible in the event that he wrecked the truck.

On the night of August 26, 1999, Ronald Martin wrecked the truck in a one-vehicle accident. The truck was towed to Wayne's Body Shop in Cottondale, Alabama, on the night of the wreck; thereafter, Ronald Martin instructed that the truck be towed to Tillery's Body Shop. Ronald Martin told Tillery's Body Shop to tear down and repair the truck.

Ronald Martin reported the wreck to Illinois National. AIG adjusts claims of Illinois National's insureds in accordance with the provisions of the insureds' policies, and, on

---

[1]Although some statements of fact are disputed, the evidence is cited in the light most favorable to plaintiff, the non-moving party, and all reasonable inferences from admissible evidence are drawn in favor of plaintiff. *See e.g., Patrick v. Floyd Med. Ctr.*, 201 F.3d 1313, 1315 (11th Cir. 2000).

August 27, 1999, Illinois assigned the adjustment of Ronald Martin's claim to AIG. AIG assigned Isaacs Claim Services, Inc. ["ICS"], an independent adjusting/appraising company, to inspect the truck and to prepare an estimate for the record.

Mike Head, an independent appraiser hired by ICS, performed the initial inspection and estimate on August 30, 1999. Head had over three years appraising cars and twenty years' experience working in an auto body shop.

ICS prepared a claim summary and an estimate after the truck was "torn down," which were sent to AIG on September 7, 1999. In these documents, ICS advised AIG that the truck was repairable. ICS estimated that the cost to repair the truck was $7,789.38 and the approximate value of the truck before the accident was $12,000. The estimated value of $12,000 was calculated by Robert Isaacs of ICS based on his experience and expertise in the industry. Isaacs has been working in the automobile industry for thirty to thirty-five years and has extensive experience as an appraiser.

At the time of the estimate, neither Isaacs nor Head were employees of AIG; rather, they were independent adjusters who performed appraisals for numerous clients. Additionally, neither Isaacs nor Head had any financial interest in the outcome of the appraisal and estimate. Isaacs was paid a flat fee of $72 for the appraisal, from which Head was paid a flat fee of $45.50. The only factor that would have changed Isaacs's rate is that, if the vehicle was a total loss, he would have received an extra $10 for additional required paperwork.

On September 8, 1999, the ICS estimate was reviewed by Dave Baumann, Specialist in AIG's Material Damage Department. Baumann reviewed the estimate for any irregularities and inaccuracies, and, in reliance on the estimate, made the determination that the vehicle was repairable. Baumann has worked in the auto industry for fifteen years and for AIG for six years.

Baumann reported that the vehicle was repairable and he approved the estimated cost of repair, $7,789.38. The adjuster on the claim, issued a check for $7,289.38 – the estimate amount less the $500 deductible. The check was payable to the insureds, plaintiff and Ronald Martin, and to the lienholder, the Alabama Credit Union.

On November 5, 1999, a supplemental request in the amount of $806.86 was received by AIG for the replacement of the truck's air bag diagnostic unit. Illinois National issued a check, payable to Tillery's Body Shop, in the amount of $806.86 to cover this supplemental repair.

On November 9, 1999, James Tillery, owner of Tillery's Body Shop, delivered the truck to plaintiff in the parking lot of the Alabama Credit Union. Plaintiff was accompanied by her brother, Harold Guy, who works in the automotive industry. Harold Guy testified that he drove the truck around the block and that he did not notice any problems. A representative of the credit union came out and looked at the truck, approved payment of the repairs, and endorsed the check on behalf of the credit union. Previously, Ronald Martin had endorsed the check. Although plaintiff claims she had observed a "very poor paint job,"

misaligned doors, and misaligned pinstripes, she endorsed the check and accepted the truck from Tillery. She gave the insurance check and a personal check for the deductible to Tillery. Thereafter, plaintiff had no more contact with Tillery or Tillery's Body Shop, and Tillery's Body Shop is not a party to this action.

On August 23, 2000, almost a year after plaintiff and Ronald Martin made a claim, plaintiff asked AIG to reinvestigate the handling of the claim and the propriety of the amount paid for damage to the truck. Upon receiving this request, AIG agreed to have the truck reinspected to determine whether the repairs had been made per the written estimate and the quality of any repairs performed by Tillery's Body Shop. AIG also reinvestigated whether the truck should have been deemed a "total loss." As part of its reinvestigation, AIG retained an independent expert appraiser to inspect and evaluate the truck.

On October 6, 2000, Alan Watts, an appraiser with Evers & Associates, Inc., inspected the truck. Although Watts found that the repairs performed by Tillery's Body Shop were "below industry standards," he found that the truck was repairable and should not have been deemed a total loss.[2] Watts did not place an actual cash value on the truck in his report.

---

[2]Watts found:

> ... I found the insured vehicle collision repairs by Tillery's Body Shop to be of poor quality. ... It appears several tasks paid for on the original ICS damage appraisal did not actually take place. It appears the bed was not set back (for access to repair the cab corners), the mirrors, belt moldings, door handles and taillights were not removed as paid for in the estimate for paint access. All these items have overspray on them due to this. The back glass . . . may have been removed and reset but it does appear that paintwork was

Rather, in reaching his decision, Watts took into account the $12,000 value placed on the truck by Isaacs and the fact that the 1999 Black Book listed the manufacturer's suggested retail price as $13,385.[3] Considering this information and the total repair costs of $8,596.24,

>   done [after] the glass was installed. The Bondo repair on the left door at the front edge near the edge of the fender does not line up properly . . . and this would likely be related to three things[:] [1] fender replacement, [2] repair for the door, [3] left fender apron not properly repaired . . . . [The bolt to the rear bracket to the left fender] is still loose and you can obviously see the bracket was bent due to the paint damage that was never corrected. In regard to my theory that the bed was not removed to properly access repairs please review photo . . ., which shows a paint run on the right cab corner and I will note that there is also roughness to the paint as you reach your hand down in the gap, which, in my opinion, reflects the bed was not removed or set back. . . . [T]ail lights were not removed as they have overspray on them. . . . [L]eft bedside panel toward the rear [has] some type of paint problem as you can see the paint bubbling in the crease area. . . . [P]aint overspray and scratches from sanding the left door on the mirror where the mirror was not removed. . . . The core support replacement has a poor appearance due to the welding being sloppy. . . . [Y]ou can see a sloppy weld which also is rusting because it was never cleaned and painted properly. . . . [T]here is a shim in the front bumper mount bracket on one side of the mount and not the other. The shim was placed to help the alignment of the front bumper which leads me to think that the frame rails are still out of line or the bumper mount brackets are still bent.
>
>   By now you get the picture that repairs are below industry standards especially for this vehicle which was a current year model at the time it was repaired.

Doc. 71, Exh. U.

>   [3]Watts stated in his report:
>
>   [B]ased on my review of the original estimate and supplement estimate supplied with the assignment it appears to me the total cost of repair was $8,596.24. We went back and pulled out August 1999 NADA but found there to be no listed values for the 1999 model truck at that time. We also pulled our August 1999 Black Book which did not have average sales values but did

6

Watts concluded, "It is my opinion based on the above reported information that AIG Specialty Auto has paid for proper repairs to the 1999 Mazda B2500 truck but Tillery's Body Shop did not properly repair the vehicle by producing a poor quality work product." Doc. 71, Exh. U. Watts has appraised cars for approximately fourteen years, and his opinions were based on his experience and knowledge in this field.

In reliance on Watts's report, AIG determined that the claim had been properly handled and again determined that the truck was repairable and not a "total loss." Thereafter, plaintiff brought these claims as set forth above against AIG and Illinois National.

## II. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that he is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his

---

> reflect a manufacture[r]s suggested retail price of $13,660.00 with a $275.00 mileage deduction applying. You will note the ICS appraisal reflects a value of $12,000.00 but I am not sure how the appraiser arrived at that value. If the $12,000.00 value was accurate, 75% of that is $9,000.00. It is my understanding the State of Alabama requires insurance companies to deem vehicles a total loss if their damage exceeds 75% of the value. In this case the damage was below the 75% of value therefore the vehicle was repairable.

Doc. 71, Exh. U.

burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III. DISCUSSION

#### A. BREACH OF CONTRACT – ILLINOIS NATIONAL

Plaintiff has sued Illinois National for breach of contract based on the payment of her claim under the insurance policy covering the truck. The parties agree that Alabama law applies to plaintiff's breach of contract claim. Pursuant to Alabama law, "The elements of a breach-of-contract claim are: (1) the existence of a valid contract binding upon the parties in the action, (2) the plaintiff's own performance; (3) the defendant's nonperformance, or

8

breach, and (4) damage." *Armstrong Business Services, Inc. v. AmSouth Bank*, 817 So.2d 665, 673 (Ala. 2001)(quoting *Employees' Benefit Ass'n v. Grissett*, 732 So.2d 968, 975 (Ala.1998)).

 1.  **Ala. Code § 32-8-87**

Plaintiff contends that the cost to repair the truck exceeded 75% of its actual cash value and that Alabama law, Ala. Code § 32-8-87, requires an insurer "total" a vehicle if the cost of repairs exceeds 75% of the actual cash value. Also, she contends this provision of Alabama law is an implied term of the insurance contract, and Illinois National breached this implied term of the contract by paying for repairs and not "totaling" the truck and assuming ownership.

Section 32-8-87, provides, in pertinent part:

> (d) For the purposes of this section, a total loss shall occur when an insurance company . . . pays or makes other monetary settlement to a person when a vehicle is damaged and the damage to the vehicle is greater than or equal to 75 percent of the fair retail value of the vehicle prior to damage ***as set forth in a current edition of a nationally recognized compilation of retail values*** . . . .

Ala. Code § 32-8-87(d)(emphasis added). The plain language of this section requires an insurance company to "total" a vehicle when the damage to the vehicle is equal to or greater than its ***book value***; it does not require a calculation of 75% of the actual ***cash value*** of the vehicle.

Therefore, for purposes of § 32-8-87(d), the court holds the actual cash value of plaintiff's truck is irrelevant. Plaintiff has presented evidence that the actual value of the

9

truck was much lower than $12,000, the actual cash value of the truck determined by Illinois National. However, she has not presented evidence that "the fair retail value of the vehicle prior to damage as set forth in a current edition of a nationally recognized compilation of retail values" was less than $11,462.[4]

Therefore, the court finds that Illinois National is entitled to summary jugdment as to plaintiff's claims claim based on its alleged failure to "total" the truck.

**2. Payment for Estimated Repairs**

Plaintiff contends that Illinois National did not pay for all necessary repairs. Illinois National has presented expert testimony that it "paid for proper repairs to the . . . truck, but Tillery's Body Shop did not properly repair the vehicle by producing a poor quality of work product." *See* Doc. 71, Exh. U. Plaintiff has not presented any evidence of any necessary repair that was not included in the estimate of repair. The question of whether the repairs, included on the estimate, were performed properly by Tillery's Body Shop is not before the court and is not relevant to the issue of whether Illinois National breached its agreement with plaintiff to pay for all necessary repairs.

Therefore, the court finds Illinois National is entitled to summary judgment as to plaintiff's claim of breach of contract based on the alleged failure to pay for all necessary repairs.

---

[4]The cost of the repairs, $8,596.24, is 75% of $11,461.65.

Based on the foregoing, the motion for summary judgment, filed by Illinois National, is due to be granted as to plaintiff's breach of contract claim.

## B. BAD FAITH – ILLINOIS NATIONAL

Under Alabama law, a plaintiff may show bad faith in two ways: (1) by showing that the insurer had "no lawful basis for the refusal [to pay] coupled with [insurer's] actual knowledge of that fact;" or (2) or by showing an insurer's "intentional failure to determine whether or not there was any lawful basis for such refusal." *Peachtree Casualty Ins. Co., Inc. v. Sharpton*, No. Civ.A. 97-D-771-N, 2001 WL 286919 at *4 (M.D. Ala. Mar. 20, 2001) (quoting *State Farm & Casualty Co. v. Slade*, 747 So.2d 293, 303 (Ala. 1999) (other citations omitted)). "[O]ne who cannot prove she was entitled to benefits under an insurance policy cannot recover on a bad-faith claim." *Shelter Mutual Insurance Co. v. Barton*, No. 1991157, 2001 WL 1021592, 10 (Ala. Sept. 7, 2001)(citing *Slade*, 747 So. 2d 293, 318 (Ala. 1999)).

In her complaint, plaintiff alleges both theories of bad faith against Illinois National. Alabama law requires that plaintiff establish that she was entitled to payment under the terms of the policy in order to prove her bad faith claims based on (1) Illinois National's failure to pay the claim, and (2) its failure to investigate the claim. *See Slade*, 747 So. 2d at 318. For the reasons set forth above, the court finds that plaintiff has not demonstrated that she is entitled to any benefits under the insurance policy at issue beyond those benefits already paid

11

to her. Therefore, Illinois National's motion for summary judgment is due to be granted as to plaintiff's bad-faith claims.[5]

## C. FRAUD, MISREPRESENTATION, AND FRAUDULENT SUPPRESSION – AIG AND ILLINOIS NATIONAL

Plaintiff contends that defendants misrepresented and/or suppressed (1) the fact that the truck was a "total loss" and (2) the fact that she had to have the truck repaired at Tillery's Body Shop.

Under Alabama law, to maintain a fraudulent representation claim, plaintiff must "establish by substantial evidence (1) a false representation; (2) of a material existing fact; (3) relied upon by [the Plaintiff]; and (4) damage as [a] proximate result of the misrepresentation. *Vulcan Painters, Inc. v. MCI Constructors, Inc.*, 41 F.3d 1457, 1461 (11th Cir. 1995) (citing *Crowder v. Memory Hill Gardens, Inc.*, 516 So.2d 602, 604 (Ala. 1987). In order to establish a claim of fraudulent suppression, plaintiff must prove by substantial evidence "(1) the suppression of a material fact; (2) that the defendant was under a duty to communicate; (3) either because of a confidential relation between the plaintiff and the defendant or because of the particular circumstances of the case." *Crowder*, 516 So.2d at 604 (citations omitted).

---

[5]The court notes that there is no evidence in the record to support the other requirements of a bad faith claim. Indeed, the record supports the manner in which Illinois National paid plaintiff's claim and that her claim was paid in full.

Also, in order to establish a cause of action for either fraudulent misrepresentation or suppression:

> The plaintiff must produce evidence of a present intent on the part of the defendant to deceive the plaintiff either by the misrepresentation of an existing material fact or by the suppression or active concealment of an existing material fact. . . . [F]urther, the misrepresentation or suppression of the existing material fact must have led the plaintiff to act to his detriment in reasonable reliance thereon.

*Id.* at 604-605 (internal citations omitted).

### 1. "Total Loss"

Plaintiff contends that defendants (1) told her that the truck was repairable when, in fact, it was a total loss; and/or (2) suppressed the fact that the truck was a total loss and could not be adequately repaired.

As set forth above, the truck was not a "total loss" as defined by Ala. Code § 32-8-87(d). Moreover, no evidence has been presented that the truck was a "total loss" as those terms are commonly understood; that is, no evidence has been presented that the cost to repair the truck was equal to or greater than its "actual cash value."

Therefore, the court finds that defendants' motion for summary judgment as to plaintiff's fraud claims based on statements regarding whether the truck was a "total loss" is due to be granted, and such claims are due to be dismissed.

### 2. Moving the Truck From Tillery's Body Shop

Plaintiff contends that defendants (1) told her that she had to have her truck repaired at Tillery's Body Shop; and/or (2) suppressed the fact that she had the right to designate where the truck would be repaired.

On or about August 30, 1999, Ronald Martin authorized Tillery's Body Shop to perform repairs on the truck. Doc. 71, Exh. M at 1. Plaintiff contends that, "toward the end of September," Head told her that "the truck had already been broken down, the parts had been ordered for it, and that I could not move it." Doc. 71, Exh. B at 68-69. Defendants contend that plaintiff was told that she had to pay Tillery's Body Shop for repairs that had been made before she could move the truck (*see* doc. 71, Exh. J at 100); plaintiff does not dispute this statement. Under the circumstances, Head's statement to plaintiff – that she could not move the truck without paying Tillery for work already done – was not a misrepresentation of a material fact. Moreover, the court finds no evidence that Head – the adjuster hired by AIG to perform the estimate on the truck – had any duty to tell plaintiff that she could move the truck to another body shop at any time before Tillery began repairs in accordance with the authorization of Ronald Martin.

Therefore, the court finds that defendants' motion for summary judgment as to plaintiff's fraud claim based on statements regarding moving the truck from Tillery's Body Shop is due to be granted, and such claim is due to be dismissed.

D.   **TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP – AIG**

Plaintiff has presented no argument in opposition to defendants' motion for summary judgment as to her claim against AIG for tortious interference with a business relationship.[6] Therefore, the court finds that plaintiff has abandoned this claim. *See Smith v. International Paper Co.*, 160 F. Supp. 2d 1335, 1347 (M.D. Ala. 2001)(citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.), *cert. denied* 516 U.S. 817 (1995)). Defendant's motion for summary judgment as to plaintiff's tortious interference claim against AIG is due to be granted, and such claim is due to be dismissed.[7]

### IV. CONCLUSION

For all of the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendants are entitled to judgment as a matter of law on all of plaintiff's claims. An order granting defendants' motion for summary judgment (doc. 71) will be entered contemporaneously with this Memorandum Opinion.

**DONE** this _30th_ day of September, 2002.

*Sharon Lovelace Blackburn*
SHARON LOVELACE BLACKBURN
United States District Judge

---

[6] See, generally, Plaintiff's Brief in Response to Defendants' Motion for Summary Judgment.

[7] The court notes that there is no evidence in the record of any intent of AIG to interfere in plaintiff's contractual or business relationship with Illinois National.